Laura CLOUD, individually and as statutory representative of the Estate of Darren Baskins, Deceased, and on behalf of Elizabeth Cloud, her minor daughter and statutory beneficiary, Plaintiff,

v.

PFIZER INC., Defendant.

No. Civ 99–627–TUC–WDB.

United States District Court, D. Arizona.

Nov. 21, 2001.

Gerald S. Maltz, Haralson Miller Pitt & McAnally PC, Tucson, AZ, Andy Vickery, Richard W. Ewing, Paul F. Waldner, III, Vickery & Waldner LLP, Houston, TX, for plaintiff.

John D. Everroad, John D. Everroad, Fennemore Craig PC, Phoenix, AZ, Malcolm E. Wheeler, James Ernest Hooper, Amy L. Padden, Wheeler Trigg & Kennedy PC, Denver, CO, for defendant.

**ORDER**

WILLIAM D. BROWNING, Senior District Judge.

Pending before the Court are the following motions filed by Defendant Pfizer:

1. Motion to Strike Declaration of Edwin Johnstone, M.D. (Doc. # 164),

2. Motion to Exclude Testimony of Dr. Edwin E. Johnstone (Doc. # 122),

3. Motion for Summary Judgment re: Causation (Doc. # 136), and

4. Motion for Partial Summary Judgment re: Punitive Damages (Doc. # 129).

For the reasons set forth below, the Motion to Strike (Doc. # 164) is DENIED, the Motion to Exclude (Doc. # 122) is GRANTED, the Motion for Summary Judgment (Doc. # 136) is GRANTED, and the Motion for Partial Summary Judgment is DENIED AS MOOT. Accordingly, the Clerk of the Court is ordered to enter judgment in favor of Defendant Pfizer and against Plaintiff Laura Cloud.

## I. Brief Factual & Procedural History

In February 1996, Mr. Darren Baskins was originally prescribed Zoloft for treatment of his depression. In August 1997, Mr. Baskins committed suicide in Safford, Arizona. Mr. Baskins' widow, Laura Cloud, now brings this product liability and negligence action against Zoloft's manufacturer Pfizer Inc. for Pfizer's alleged failure to warn and/or provide proper instructions regarding the potential side-effect of suicide. She essentially claims that Zoloft caused Mr. Baskins to experience side-effects that resulted in his committing suicide, and that Pfizer knew of these side-effects yet failed to warn about the potential risks. On a previous motion for summary judgment, this Court rejected Pfizer's arguments that Plaintiff's claims were preempted by the federal Food, Drug, and Cosmetic Act (FDCA).

### A. Brief History of Zoloft Before the Food and Drug Administration

On April 13, 1998, Pfizer submitted a New Drug Application to the Food and Drug Administration (FDA) seeking approval to market Zoloft for the treatment of depression. Zoloft is the registered trademark and brand name in the United States for sertraline hydrocloride. Sertraline hydrocloride is one of a class of medicines commonly referred to as "selective serotonin reuptake inhibitors" or "SSRIs." Prozac, Paxil, and Celexa are other popular SSRIs. In conjunction with its application, Pfizer submitted 117 volumes of safety data and later submitted a report on suicide attempts by patient who were prescribed Zoloft. After changes to Pfizer's proposed label, the FDA finally approved Zoloft on December 30, 1991.

FDA approved labeling must contain a number of specific sections. The sections relevant to Plaintiff's claim include: (1) contradindications, (2) warnings, (3) precautions, and (4) adverse reactions. *See* 21 C.F.R. § 201.56. Particular to this matter, the final approved label for Zoloft contained the following "precaution:"

> Suicide—The possibility of a suicide attempt is inherent in depression. Close supervision of high risk patients should accompany initial drug therapy. Prescriptions for Zoloft should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose.

Under the "adverse reactions" section, Pfizer disclosed on its label as follows:

> Psychiatric disorders—Infrequent: abnormal dreams, aggressive reaction, amnesia, apathy, delusion, depersonalization, depression, aggravated depression, emotional liability, euphoria, hallucination, neurosis, paranoid reaction, suicide ideation and attempt, teeth-grinding, abnormal thinking; Rare: hysteria, somnambulism, withdrawal syndrome.

Subsequent to its approving Zoloft to treat depression, the FDA also approved Zoloft as safe and effective for the treatment of obsessive compulsive disorder (October 25, 1996), panic disorder (July 8, 1997), pediatric obsessive compulsive disorder (October 10, 1997), and post-traumatic stress disorder (December 7, 1999). In each of these approvals, the FDA ordered Pfizer to include the same notice about suicide in the "adverse reactions" section of the label.

### B. Brief History of Other SSRIs Before the Food and Drug Administration

Before and after the FDA's approval of Zoloft, the FDA considered applications concerning other SSRIs, and claims that the SSRIs cause suicide.

In October 1990, the Church of Scientology filed a petition with the FDA claiming that Prozac caused suicide and asking the FDA to withdraw its approval. In May 1991, the Public Citizen Health Research

Group requested that the FDA require the makers of Prozac to label the drug with a boxed warning indicating that Prozac may be associated with suicide in a small number of patients.

In July 1991, the FDA denied the Scientology petition noting that "[t]he data and information available at this time do not indicate that Prozac causes suicidality or violent behavior."

In September 1991, the FDA convened the Psychopharmacological Drugs Advisory Committee (PDAC) to investigate any link between pharmacological treatment of depression and suicidality. The PDAC unanimously found that there was no credible evidence to support a conclusion that antidepressant drugs cause the emergence or intensification of suicidality or other violent behaviors. The PDAC also unanimously found that there was no evidence to indicate that a particular drug or drug class poses a greater risk for the intensification of suicidal thoughts and/or violent behaviors. The PDAC also voted 6–3 not to recommend changing the labeling of anti-depression drugs.

In June 1992, the FDA denied the Public Citizen petition finding that the evidence was "not sufficient to reasonably conclude that the use of Prozac is possibly associated with suicidal ideation and behavior."

In 1997, the FDA denied a petition to expand the suicidality warning on Prozac noting that it had continued to monitor any links between Prozac and suicidality.

### C. Brief History of Research Regarding the Link Between SSRIs and Suicide

Both parties have submitted volumes of medical research articles and cases studies to the Court. While not totally exhaustive, the following summaries are offered as a synopsis of the medical community's thoughts regarding the alleged causal link between SSRIs, particularly Zoloft, and suicide:

### Pre–August 1997 Research[1]

- In September 1989, Joseph F. Lipinski, Jr., M.D., et.al., published a study, based upon case reports, possibly linking akathisia[2] with fluoxetine (Prozac).

- In February 1990, Harvard psychiatrists Teicher and Cole published an article concerning SSRIs and drug-induced suicidal ideation. The article described six patients who, during treatment with Prozac, experienced either the onset or intensification of suicidal ideation.

- In 1991, Robert A. King, M.D., et.al., published a study in which self-injurious ideation appeared de novo or intensified during fluoxetine (Prozac) treatment of obsessive-compulsive disorder. Because of the nature of the study, King was not able to link fluox-

1. The Court has divided the research into pre-August 1997 and post-August 1997 research in order to clearly set forth the status of the medical literature before Mr. Baskins' suicide in August 1997.

2. According to Plaintiff's expert, akathisia is a neurological term describing a person who "has a kind of unwished for, out-of-their control sense of being at the brink of moving." He testified that subjective complaints include a difficulty trying to sit for a great length of time or a sense of trembling. Akathisia is defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM) as "subjective complaints of restlessness accompanied by observed movements (e.g. fidgety movements of the legs, rocking from foot to foot, pacing, or inability to sit or stand still) developing within a few weeks of starting or raising the dose of a neuroleptic medication (or after reducing a medication used to treat extrapyramidal symptoms.") Whereas, David Healy, M.D. defines it more broadly as an excited state of unrest.

etine with the self-injurious ideation but encouraged increased studies and vigilance.

- In 1991, W. Creaney, et.al., published an article including two case reports of patients developing akathisia and suicidal ideation while taking fluoxetine.

- In 1991, Anthony J. Rothschild, M.D., et.al., published an article listing their findings of three patients. The three patients had previously made serious suicide attempts while taking fluoxetine. When being reintroduced to the drug, they began to develop akathisia. Again, these researchers urged clinicians to monitor the development of akathisia in their patients.

- In November 1991, Dr. John Mann and Dr. Kapur issued an article indicating that clinicians should warn patients of the possible occurrences of suicide while on antidepressants, but was unable to state whether such drugs could precipitate or worsen suicidality.

- In 1991, Roger M. Lane, M.D. of Pfizer linked the administration of SSRI to rare cases of drug-induced akathisia in some patients.

- An internal Pfizer 1992 study indicated no correlation between Zoloft and suicide attempts and suicidal ideation. Those results were published in May 1992 and presented at the Collegium International Neuro–Psychopharmnacologicum in June 1992.

- In July 1992, Wirshing, et.al. reported the occurrence of suicidal ideation in five patients with fluoxentine (Prozac)—induced akathisia and suggested a link between akathisia and suicidal ruminations.

- In November 1992, Margaret S. Hamilton, et.al., published a report entitled "Akathisia, Suicidality, and Fluoxetine." They suggested that " 'suicidal ideation' reported in the patients taking fluoxetine described in this article as well as in our own patient is really a reaction to the side effect of akathisia and not true suicidal ideation as is typically described by depressed patients experiencing suicidal ideation."

- In February 1993, the American College of Neuropsychopharmacology's Council and Task Force issued a consensus statement in which it found that "[t]here is no evidence that antidepressants such as the selective serotonin reuptake inhibitors ... trigger emergent suicidal ideation over and above rates that may be associated with depression and other antidepressants." However, the consensus statement also indicated that "patients should be warned that suicidal ideation may occasionally worsen in the course of treatment, as may overall depression, and that such an event would be a reason for immediately contacting their [the patients'] doctor. It should be recognized that such emergent suicidal ideation may be the consequence of the patient's illness, adverse changes in the life situation, or perhaps, in a few cases, because of an adverse effect of the antidepressant."

- In June 1993, Lauren D. LaPorta, M.D. printed two case reports of sertraline-induced akathisia in their patients.

- In August 1993, Seymour Fisher, Ph. D., et.al, published a study reviewing medical data on patients receiving fluoxetine and trazodone. The study reported cases of delusions, hallucinations, aggression, and suicidal ideation in patients receiving fluoxetine.

- In August 1993, Teicher & Glod, et.al., summarized the literature in the area. They noted that akathisia, insomnia, as well as manic and mixed-manic states could result from the administration of

anti-depressant drugs. The report emphasized the lack of reliable data and the need for additional research in these areas.

- In September 1993, R. Balon published a case report of suicidal ideation with sertraline treatment.

- In January 1994, in the American Journal of Psychiatry, there was published a case report of an unsuccessful suicide overdose attempt another report of a panic attack potentially linked to sertraline.

- In 1994, Dr. David Healy reviewed the evidence linking fluoxetine with suicide. He summarized as follows:

In the opinion of this author, the volume of case reports and other studies is sufficient to demonstrate that antidepressants and antipsychotics may induce suicidal ideation in certain individuals under certain conditions. These reports must be set against a general recognition that the peak time for suicide attempts is shortly after individuals start treatment with a new antidepressant. . . . Suicidal ideation associated with fluoxetine is probably not a direct effect of fluoxetine, but is mediated through the induction of akathisia/ agitation/panic. . . . Such reactions to fluoxetine are rare, and undue concern over them may lead to more suicides by virtue of patients giving up treatment.

- In 1995, Elaine Tierney, M.D., et.al., published a retrospective study finding some evidence of behavioral activation or mania in some patients.

- In 1995, Susan S. Jick, et.al., reviewed a database of 495 general practitioners that indicated that fluoxetine (Prozac) might pose a higher risk for suicide.

- In 1995, George M. Anderson, Ph.D., et.al., published an article in which they concluded as follows:

Pending a better understanding for the pathogenesis and risk factors for SSRI-linked adverse effects, several precautions appear prudent. Patients and their families should be alerted to the possibility of increased restlessness, disinhibition, agitation, or suicidal preoccupation and encouraged to report any signs of their occurrence.

- In 1995, Roger Lane, et.al., reviewed the articles on point and believed that Teicher's 1990 article possibly linking suicide to SSRIs had "been shown to be without foundation in analyses of the clinical trial experience with several SSRIs."

- In 1996, at a conference sponsored by the American Psychiatric Association a handout noted case reports linking akathisia-like syndrome with suicide.

- In 1996, Pfizer reported 54 cases of suicidal thinking or behavior of patients on sertraline to the Irish Medicines Board.

- In 1997, Arturo Olivera published an article entitled "Sertraline and Akathisia: Spontaneous Resolution." The article reports that 4 out of 25 individuals receiving sertraline developed akathisia

### Post–August 1997 Research

- In 1998, Richard Goldberg, M.D. published an article reviewing the scientific literature on the possible side effects of SSRIs. The article indicated that SSRIs may produce akathisia that "may be so intense that some patients have attempted suicide."

- In 1998, Bonnet–Brillhault, et.al., published an article that included a case report of SSRI-induced akathisia. The article warned clinicians to recognize early symptoms of akathisia in patients that might be at a high risk for suicide.

- In July 1999, Pfizer conducted a review entitled "Sertraline and Suicide–Related Events." Using its "early alert safety database" that included information reported to Pfizer, government agencies, and published literature, Pfizer noted 846 sertraline cases associated with suicidal events (death, attempt, gesture, and ideation events). Pfizer concluded that there was no basis for linking Zoloft with these suicide attempts.

- In the 1999 publication of the *Textbook of Psychiatry* (3rd edition), the authors noted studies showing a possible link between SSRI-induced akathisia and suicide and also studies indicating that SSRIs may selectively decrease suicidality in some patients. The conclusion, however, was that the "literature to date is too preliminary to support the hypothesis that SSRIs are the antidepressants of choice in the suicidal patient because of neuro-transmitter action."

- In 2000, the *Diagnostic and Statistical Manual of Mental Disorders* (4th edition) (DSM–IV–TR) noted that "serotonin-specific reuptake inhibitor antidepressant medications may produce akathisia that appears to be identical in phenomenology and treatment response to Neuroleptic–Induced Acute Akathisia." The latter was described as follows:

Subjective complaints of restlessness and at least one of the following observed movements: fidgety movements or swinging of the legs while seated, rocking from foot to foot or "walking on the spot" while standing, pacing to relieve the restlessness, or an inability to sit or stand still for at least several minutes. In its most severe form, the individual may be unable to maintain any position for more than a few seconds. The subjective complaints include a sense of inner restlessness, most often in the legs; a compulsion to move one's legs; distress if one is asked not to move one's legs; and dysphoria and anxiety. The symptoms typically occur within 4 weeks of initiating or increasing the dose of neuroleptic medication and can occasionally follow the reduction of medication used to treat or prevent acute extrapyramidal symptoms . . .

- In 2000, Ronald W. Maris, et.al., noted, in the *Comprehensive Textbook of Suicidology,* the literature possibly linking SSRIs with akathisia and resultant suicide.

- In 2000, David Healy presented a paper on the "Emergence of antidepressant induced suicidaility." In a double blind study, Dr. Healy found that after giving sertraline to a group of twenty healthy volunteers, two volunteers became suicidal after experiencing akathisia and disinhibition. Dr. Healy concluded that one of the messages from the study was that "those who did not suffer from a psychiatric illness may have been at more risk from this drug than others."

- In 2000, Stuart Donovan and Andrew Clayton, et.al., published an article entitled "Deliberate self-harm and antidepressant drugs." This naturalistic study used hospital records of patients who had been prescribed either tricyclic antidepressant (TCA) drugs, SSRIs, or other drugs. Using a baseline of amitriptyline, a TCA, that showed the lowest relative incidence of deliberate self harm, the authors found that sertraline (Zoloft) had a relative risk of 4.9 to amitriptyline, fluoxetine (Prozac) had a 6.6 relative risk, and all SSRIs combined had a 5.5 relative risk. However, the authors concluded by stating as follows:

It is difficult to attribute the cause of DSH [deliberate self harm] behaviour to

antidepressant treatment when such behaviour can also occur spontaneously during the course of depressive illness. Establishment of cause and effect for the different apparent risks of DSH associated with different antidepressants seen in this study is therefore almost impossible.

- In a 2000 report, the Irish Medicines Board issued a report on Lustral (the brand name of sertraline in Ireland). The report indicated a number of cases of suicide attempts and completed suicides related to the administration of sertraline.

- In August 2000, the Medicines Control Agency (CSM) in Sandwich, United Kingdom noted that there was no "causal association between SSRIs and suicidal behaviour." Yet, based on continued anecdotal reports of suicidal behavior and general clinical evidence of increased suicidal behavior in the first few weeks of treatment, the CSM proposed the following update to patient information leaflets:

Occasionally, thoughts of suicide or self harm may occur or may increase in the first few weeks of treatment with sertraline, until the antidepressant effect becomes apparent. Tell your doctor immediately if you have any distressing thoughts or experiences.

- In January 2001, Adrian Preda, M.D., et.al. published an article reporting their findings of a retrospective study of 533 psychiatric patients at Yale–New Haven Hospital. The study reported 43 cases of psychosis or mania (8.1%) related to the administration of anti-depressant drugs. However, the authors noted that the study had multiple limitations in proving causation and concluded that "we consider this report primarily a case series highlighting the issue of antidepressant-induced mania and psychosis, not a study of incidence or prevalence of this phenomenon."

- On September 4, 2001, John Concato, M.D. and John M. Davis, M.D. submitted an independent experts report to Judge Kathryn H. Vratil, District Court Judge for the United States District Court for the District of Kansas, in the matter of *Miller v. Pfizer Inc.*, Case No. 99–2326 KHV. In their report, Drs. Concato & Davis reviewed the proffered expert testimony of Dr. David Healy. Based upon the materials provided to them, the doctors found that the evidence did not show a "quantitatively or statistically significant association between sertraline use and suicide." They also rejected any causal link supposedly found in the 1995 Jick and 2000 Donovan studies. Regarding Dr. Healy's testimony, they concluded:

- Dr. Healy's calculation of a relative risk of 2.19 for sertraline-suicide association has not been subject to peer review, and they could not replicate it.

- Dr. Healy's methodology for determining causation has not been accepted in the relevant scientific community, and Dr. Healy's reliance on case reports is not an accepted methodology to determine causation.

- They also rejected the proposition that American Psychiatric Press Textbook of Psychiatry and the articles contained therein support an association between sertraline and suicide.

- Dr. Healy's approach of linking sertraline to akathisia to suicide is not a customary approach in the scientific community.

### D. Darren Baskins' Background

Mr. Baskins & Plaintiff were married in August 1992 in Kansas, and they had one daughter, Elizabeth. Mr. Baskins had been married previously and had one son from that prior marriage. He also had little contact with that son. In 1997, Mr. Baskins and his family, including two of Plaintiff's children from another marriage, moved to Safford, Arizona from Lawrence, Kansas. Mr. Baskins was a heating and air conditioning technician.

### Medical History

According to Plaintiff, in October 1995, Mr. Baskins suffered from some minor depression. In February 1996, Daniel T. Collins, M.D. prescribed him some Zoloft samples. After returning to Dr. Collins, the prescriptions were increased. In a March 15, 1996 report, Dr. Collins noted that Mr. Baskins "had a little bit of agitation but this has settled down." Pharmacy records indicate that Mr. Baskins refilled his monthly prescription of Zoloft from February 1996 until August 1997. Therefore, it appears that Mr. Baskins took Zoloft for 18 months until his death on August 30, 1997.

In addition to his treatment from Dr. Collins, Mr. Baskins also saw the family's pastor, Pastor Leslie Maloney, as well as a counselor/therapist Christine Hartzler, M.A., CPC. Mr. Baskins and Plaintiff were having problems with their marriage, and Plaintiff had recently threatened to leave him prior to his hospitalization in August 1997. Furthermore, there is testimonial and documentary evidence that Mr. Baskins consumed alcohol and also smoked marijuana.

### Testimony Regarding Mr. Baskins' Behavior While He Was Taking Zoloft

Regarding Mr. Baskins' behavior while on Zoloft, the parties have submitted deposition testimony from various witness and answers to interrogatories including the following:

- Plaintiff claims that while Mr. Baskins rarely drank prior to taking Zoloft, he had a "strong craving" for alcohol while on the medication.

- Plaintiff has also testified that while on Zoloft, Mr. Baskins would pace back and forth, was extremely restless, had difficulty sleeping, and complained that his skin hurt from the inside out.

- Ms. Nicolee Shandy, an employee of Plaintiff and Mr. Baskins, testified that she never saw Mr. Baskins pace, wring his hands, shake, in a manic or euphoric state, or complain that his skin hurt from the inside out.

- Likewise, his son Michael Baskins did not see any similar actions while Mr. Baskins was on a trip to Kansas that he took not long before his suicide.

- Mr. Baskins' step-son, Jacob, testified that he never saw Mr. Baskins have any trouble sitting still, pacing, or any other restless behavior. He did testify, however, that Mr. Baskins did experience difficulty sleeping.

### The Week Leading Up To Mr. Baskins' Hospitalization & Suicide

In the week leading up to his suicide, Mr. Baskins dropped an air conditioner on his knee on August 25, 1997. On August 26, 1997, he cut off the end of his finger. Plaintiff then took Mr. Baskins to see Ms. Hartzler who diagnosed Mr. Baskins as being suicidal. Ms. Hartzler's August 27, 1997 note indicates that Mr. Baskins' mood was flat. From her records, it appears that Ms. Hartzler had seen Mr. Baskins on two prior occasions in January 1997 while she was counseling Plaintiff. In her deposition, Ms. Hartzler testified that she did not see any signs of akathisia in Mr. Baskins on August 27, 1997.

Based upon Ms. Hartzler's advice, Plaintiff then took Mr. Baskins to St. Mary's

Hospital in Tucson, Arizona on August 27, 1997. The St. Mary's admitting physician does not believe that Mr. Baskins was suffering from akathisia when he admitted him on August 27, 1997. Some notes in the St. Mary's records indicate that Mr. Baskins reported problems with insomnia, and span of concentration. Dr. John Ely noted that these symptoms appeared to be psychomotor restlessness. Also St. Mary's employee Kevin Delmastro testified that Mr. Baskins "had some element of impaired concentration during the interview; that he had complained about difficulty sleeping." However, he did not observe any pacing or fidgety movements. On August 28, 1997 Mr. Baskins reported that his ability to think and concentrate had improved. Finally, Ms. Adrienne O'Hare testified that during her counseling visits with Mr. Baskins at St. Mary's Hospital, she did not see any agitation or pacing.

Mr. Baskins' records from St. Mary's reveal that he had cannabinoids and amphetamines in his system. The most likely scenario regarding the amphetamines is that they came from some diet medications (Mini Thins) that Mr. Baskins was taking. In his deposition, Plaintiff's expert, Dr. Edwin Johnstone, testified that he could not be certain that the Mini Thins caused the lab report to be positive for amphetamines but that he would need to check with a toxicologist.

On August 29, 1997, two days after being admitted, the hospital released Mr. Baskins, and Pastor Maloney drove him back to Safford. Pastor Maloney described Mr. Baskins as "down," "lethargic," and "quiet" while he drove him back to Safford. That evening, Plaintiff would not let him stay in their home. On August 30th, also the birthday of Plaintiff's daughter from another marriage, Mr. Baskins had various interactions with the family including giving some cards and gifts to the family. After a conversation with Mr.

Baskins, Plaintiff left her home and took the children with her. Upon Plaintiff's request, Pastor Maloney went to the couple's residence and found Mr. Baskins was dead, having hanged himself in the outbuilding.

## II. Pending Motions & Analysis

### A. Motion to Strike Declaration of Edwin Johnstone, M.D.

In its motion, Pfizer argues that Dr. Johnstone's affidavit, submitted in support of Plaintiff's Response to Pfizer's Motion to Exclude, should be stricken because it was untimely filed in response to the Motion to Exclude and because it was untimely disclosed. In response, Plaintiff argues that its disclosure was timely filed in response to Pfizer's motions and that there were no new opinions set forth in the affidavit.

Pfizer's motion is denied for the following reasons. First, this Court has already deemed Dr. Johnstone's affidavit, as well as the rest of Plaintiff's exhibits, filed timely in response to the pending motions. *See* Doc. # 147. Second, after reviewing Dr. Johnstone's entire deposition testimony, expert report, and affidavit, the Court finds that any untimely disclosure of Dr. Johnstone's affidavit is harmless to Pfizer. *See* Rule 37(c)(1), Fed.R.Civ.P. Based upon the extensive questioning by Pfizer's counsel, Dr. Johnstone covered all the topic areas and opinions contained in his affidavit, as well as others, during his deposition. Therefore, the Court denies Pfizer's Motion to Strike.

### B. Motion to Exclude Testimony of Dr. Edwin E. Johnstone

In its motion, Pfizer argues that Dr. Johnstone's testimony should be excluded because he fails to satisfy both the reliability and fit prongs of *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993). In response, Plaintiff argues that Dr. Johnstone's testimony is admissible, and that a jury should decide whether to accept or reject his opinions. For the reasons set forth below, Dr. Johnstone's testimony is excluded.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The rule provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

■ In considering the admissibility of Dr. Johnstone's testimony, Plaintiff bears the burden of establishing the pertinent admissibility requirements are met by a preponderance of the evidence. *See Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (noting standard governing Rule 104(a), Fed.R.Civ.P.). Furthermore, this Court must exercise its "gatekeeping role" in determining whether Dr. Johnstone's testimony is admissible. *See Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In exercising its "gatekeeping role," this Court is not required to conduct a separate evidentiary hearing on admissibility of Dr. Johnstone's proffered expert testimony. *See U.S. v. Alatorre,* 222 F.3d 1098, 1102 (9th Cir.2000).

■ Under the first prong of the *Daubert's* two-prong test for admissibility of expert testimony, "[t]he adjective 'scien-

tific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. The trial court's obligation under Rule 702 and *Daubert* is to determine evidentiary reliability, or trustworthiness. *See id.* at 590 n. 9, 113 S.Ct. 2786. Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science—the focus is on principles and methodology, not conclusions. *See id.* at 595–96, 113 S.Ct. 2786. The Supreme Court listed four non-exclusive factors for consideration in the reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *See id.* at 593–94, 113 S.Ct. 2786. In addition, the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") has also noted that a "very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) ("*Daubert II* "). If the evidence is not based upon independent research, this Court must determine whether there exists any "other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.' " *Id.* at 1317–18 (internal quotation marks omitted). Generally, peer review meets this requirement yet it may also be met by:

precisely [explaining] how [the experts] went about reaching their conclusions

and point[ing] to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.

*Id.* at 1319 (citing *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir.1994)). As the United States Supreme Court recently reaffirmed in *Kumho Tire*, "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

 Rule 702's second prong concerns relevancy, or "fit." *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. The scientific knowledge must be connected to the question at issue. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994), *cert. denied sub nom., General Electric Company v. Ingram*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The trial court "must ensure that the proposed expert testimony is 'relevant to the task at hand,' ... i.e., that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. "[T]he standard for fit is higher than bare relevance." *In re Paoli*, 35 F.3d at 745. Scientific expert testimony introduces special dangers to the fact-finding process because it "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (internal quotation marks and citation omitted). Therefore, federal judges must exclude proffered scientific evidence under Rule 702 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury. *Daubert II*, 43 F.3d at 1321.

Finally, even under *Daubert*, this Court must still weigh the balancing factors of Fed.R.Evid. 403,

> Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.... Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than lay witnesses."

*Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, quoting 138 F.R.D. 631, 632 (1991).

### Dr. Johnstone's Training & Experience

Dr. Johnstone is a board certified psychiatrist in Texas. He has practiced for over 33 years. He also spent over twenty years on a committee at a psychiatric institute at which he was personally responsible for doing post-mortem, psychological autopsies. In his deposition, he testified that he serves only as a consultant or expert witness regarding psychiatry. Relevant to this case, he was also a clinical investigator in the pre-marketing clinical trials of Zoloft.

He claims to have some experience in suicidology,[3] yet he has not conducted any research in that area and does not hold himself to be an expert in that area. Dr. Johnstone does not have a degree in psychopharmacology,[4] and he does not claim

---

**3.** Suicidology is the study of human behavior and the phenomenon of suicide.

**4.** Psychopharmacology is the science of drug-behavior relationships.

to be a psychopharmacologist. However, he claims expertise based in part upon his experience conducting clinical trials of sertraline (Zoloft) between 1984 and 1986. Dr. Johnstone also does not consider himself an expert in the field of epidemiology, statistical analysis, FDA regulations of pharmaceutical drugs, and prescription drug labeling.

Regarding his experience with Zoloft, Dr. Johnstone has had no clinical experience with a patient committing suicide while on Zoloft. He also has not published any articles, given any testimony, or communicated to scientific organizations or government agencies that Zoloft or other SSRIs cause suicide. In this case, Dr. Johnstone expresses for the first time his opinion that Zoloft causes suicide.

### Dr. Johnstone's Deposition Testimony & Affidavit

Regarding the general causal link between Zoloft and suicide, Dr. Johnstone, in his deposition, relied upon a declaration by Dr. Healy's analysis of a Pfizer clinical trial. In that declaration, Dr. Healy stated that the trial revealed "a relative risk of approximately 1.9 for sertraline versus placebo and a greater risk for sertraline than for comparator antidepressants." Dr. Johnstone, however, did not have the underlying information or Dr. Healy's work to verify the conclusions. Regarding the various studies that have been conducted, Dr. Johnstone testified:

- He does not believe that uncontrolled case reports of suicide ideation by patients being treated with SSRIs are a reliable source of scientific information.
- He also has not read any placebo controlled clinical trial showing a higher incidence of suicide in depressed patients taking Zoloft than those taking a placebo.
- He claims that the 2000 Donovan naturalistic study cannot establish reliable

causal proof but is "strongly suggestive" of a line between Zoloft and suicide.

- He is not aware of any medical or scientific studies that Zoloft increases the risk of suicide in depressed patients or that demonstrate a casual relationship between the use of Zoloft, mixed manic states and suicide.
- Regarding the 2000 published study by Healy, Dr. Johnstone notes the study's importance in demonstrating "a difference between a drug selected because it specifically is a booster of serotonin activity versus equally effective antidepressant that specifically does not boost serotonergic activity, boosts noradrenergic activity." He also testified that the study is not reliable scientific evidence that Zoloft causes suicide in depressed patients.

Regarding specific causation, Dr. Johnstone does not believe that Mr. Baskins developed akathisia from Zoloft. He stated clearly that "[i]t's not my opinion that he developed akathisia from Zoloft and that made him—maybe led to the suicide. No. That's not my opinion." Rather, his opinion is that the combined effects of Zoloft and the over-the-counter stimulant "together generated in him a dysphoric, manic state, with suicidal desperation and suicidal intent being a feature of that and maybe an additional influence of command hallucinations suggesting that he [commit] suicide." He has no specific articles, just general medical knowledge, regarding the toxic effects of combining diet pills and Zoloft. Relying upon a St. Mary's nurse's note indicating that Mr. Baskins was experiencing auditory hallucinations that he could not understand, Dr. Johnstone has testified that "more likely than not the presence of the auditory hallucinations was related to the Zoloft and very likely related to some kind of toxic effect of the

combination of Zoloft and the over-the-counter stimulants."[5]

In his recently disclosed affidavit attached to Plaintiff's Response, Dr. Johnstone sets forth the following:

- A "psychological autopsy," like he applied in this case, is the primary methodology used in determining the causes behind a person's suicide.

- He believes that the 2000 Donovan study, in which "Zoloft showed a relative risk of inducing deliberate self-harm at a rate of 4.9 times the rate for Amitriptyline," has proven "on a sound scientific basis" that Zoloft can "induce suicide in patients at a substantially higher rate than previous types of drugs for depression."

- "SSRI-induced suicides are commonly, but not invariably preceded and accompanied by dystonia and/or akathisia."

- He also claims to have "seen several instances where SSRI antidepressants induced a craving for alcohol and stimulants in previously abstinent individuals."

- He also links Mr. Baskins' suicide to Zoloft because Mr. Baskins had pledged not to drink alcohol yet after taking Zoloft began to drink. Further, he stated that "it is typical for patients with SSRI-induced manic psychosis to aggravate their condition further by beginning to drink and to take stimulants as Mr. Baskins did. Thus, in my opinion, more likely than not Mr. Baskins would have remained abstinent and would not have become manic but for the effects of the Zoloft."

### The Reliability of Dr. Johnstone's Testimony

After reviewing the volumes of submitted materials, the Court finds that Pfizer's motion to exclude should be granted. As set forth more fully below, Plaintiff has failed to show that Dr. Johnstone's methodology and, therefore, his testimony are reliable. Even assuming he is qualified to speak about general causation, the medical and scientific articles, upon which he relies to support his opinion that Zoloft causes suicide, do not support his conclusion. Based upon relevant case law, the Court does not believe that Dr. Johnstone can jump from articles, that he testified are only suggestive of a link between Zoloft and suicide, to a reliable conclusion that Zoloft causes suicide. Regarding specific causation, Dr. Johnstone's conclusions are not supported by the medical literature or any admissible evidence. As a result, Dr. Johnstone's testimony regarding both general and specific causation is excluded as it is unreliable and, as a result, would likely mislead and confuse the jury.

In applying *Daubert* to Dr. Johnstone's proposed testimony, the Court finds it helpful to classify that testimony into two categories—testimony regarding general causation (does Zoloft cause suicide) and specific causation (did Zoloft cause Mr. Baskins to commit suicide). This is helpful because in order to carry her burden of proof, Plaintiff must show both general and specific causation. *See e.g., Raynor v. Merrell Pharmaceuticals, Inc.,* 104 F.3d 1371, 1376 (D.C.Cir.1997) (explaining the difference between specific and general causation in similar product liability cases).

### Testimony Regarding General Causation

██ Regarding general causation, even if we assume that Dr. Johnstone has the

5. The Court would note that in his drug and alcohol assessment at St. Mary's, however, Mr. Baskins denied any auditory hallucinations.

expertise to give testimony on issues of epidemiology and psychopharmacology and disregard his deposition testimony denying his expertise in these areas, there is a missing link between the studies upon which he relies and his testimony in this case. Recently, the Ninth Circuit reaffirmed the principle that experts can rely upon the published research of others to support their findings; however, it also allowed the district court, on remand, to "plumb the depths of the precise relationship between the materials cited and the conclusions drawn." *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir.2001).

In this case, when the Court plumbs the depths of the relationship between the cited materials and conclusions drawn, Dr. Johnstone's testimony that Zoloft causes suicide appears unreliable. Essentially, Dr. Johnstone's own testimony brings into question whether the studies, upon which he relies, employed reasonably accepted methods of proving causation. For example, in his affidavit, he relies upon the 2000 retrospective naturalistic study done by Donovan, et.al. However, in his deposition, he testified that the Donovan study cannot establish reliable causal proof but is only strongly suggestive of a line between Zoloft and suicide. In his affidavit, Dr. Johnstone also relies on the 2000 Preda article; however, the authors of that article admitted the multiple limitations of the study in proving causation and concluded that "we consider this report primarily a case series highlighting the issue of antidepressant-induced mania and psychosis, not a study of incidence or prevalence of this phenomenon." In essence, the Preda article suffers from many of the same deficiencies regarding proof of legal causation as the Donovan article. Dr. Johnstone also relies

on Dr. Healy's 2000 study in his affidavit, yet in deposition, he testified that he does not believe the Healy study is reliable scientific evidence that Zoloft causes suicide in depressed patients.[6] Additionally, Dr. Johnstone testified that he is not aware of any medical or scientific studies that show that Zoloft increases the risk of suicide in depressed patients or that demonstrate a casual relationship between the use of Zoloft, mixed manic states and suicide. Therefore, it is difficult to accept Dr. Johnstone' proposed testimony that Zoloft causes suicide when he, himself, has stated that the studies upon which he relies do not fully support that conclusion. Furthermore, at best, Dr. Johnstone has testified that the articles upon which he relies are only "strongly suggestive" of the fact that Zoloft causes suicide. In light of the Ninth Circuit's opinion in *Daubert II*, where it held that it was insufficient for the plaintiffs' experts to speak of possibilities without attempting to quantify those possibilities, Dr. Johnstone's testimony on general causation is insufficient and unreliable. *See Daubert II*, 43 F.3d at 1322.

In addition, it is also important to consider other evidence upon which Dr. Johnstone relies for his general causation testimony. For example, much of the literature in this area are merely retrospective case reports (or Adverse Experience Reports) of particular patients who had a suicidal event while taking Zoloft. As Dr. Johnstone admitted in his deposition, such case reports do not provide reliable scientific evidence of causation. Rather, they are merely compilations of occurrences, and have been rejected as reliable scientific evidence supporting an expert opinion that *Daubert* requires. *See Jones v. United States*, 933 F.Supp. 894, 899–900

---

6. Additionally, it should be recalled that Drs. Concato and Davis raised serious concerns about Dr. Healy's methodology in a September 2001 independent experts report to Judge Kathryn H. Vratil.

(N.D.Cal.1996), *affirmed* 127 F.3d 1154 (9th Cir.1997), *cert. denied* 524 U.S. 946, 118 S.Ct. 2359, 141 L.Ed.2d 728 (1998) (anecdotal case reports are not derived through the scientific method and "fall short of the proven, cause and effect relationship that is necessary to satisfy the *Daubert* standard."). *See also Casey v. Ohio Medical Products*, 877 F.Supp. 1380, 1385–1386 (N.D.Cal.1995) (case reports are not reliable scientific evidence of causation and not sufficiently based on scientific reliability and methodology to be admitted into evidence under Fed.R.Evid. 702 and 703). Additionally, Dr. Johnstone relies upon Pfizer's report to the Irish Medicines Board as evidence of general causation. However, the Irish Medicines Board report, based upon Pfizer's clinical trials, lacks any reliability on the issue of general causation. *See Smith v. Pfizer Inc.*, 2001 WL 968369 (D.Kan.2001) (setting forth both the Pfizer's report and the instructions given to the clinicians and rejecting Plaintiff's assertion that Pfizer had admitted general causation in the report).

Dr. Johnstone also has not provided sufficient epidemiological evidence of causation. "For an epidemiological study to show causation under a preponderance standard, the relative risk of [the harm caused] arising from the epidemiological data ... will, at a minimum, have to exceed 2." *Daubert II*, 43 F.3d 1311 at 1321

(quotation omitted). The Ninth Circuit did provide, however, that in a particular case, a relative risk under 2 might be sufficient if an expert can differentiate between the particular plaintiff and the subjects of the statistical studies. *See id.* at 1321, n. 16.[7] In this case, Dr. Johnstone relies upon the Donovan study to provide that Zoloft had a relative risk of 4.9 to the index drug, amitriptylene. However, in addition to the other problems with the Donovan study about which Dr. Johnstone has commented, the study did not evaluate the relative risk compared to unexposed population (i.e., a group that takes a placebo), which is the general method in which to produce an accurate relative risk. In addition, in his deposition, Dr. Johnstone relied upon Dr. Healy's work, yet admits in his affidavit that he has not reviewed the internal details of the study or Dr. Healy's data analysis. As a result, Plaintiff has not shown Dr. Healy's work to be reliable, nor could Dr. Johnstone explain Dr. Healy's findings to the jury. Finally, the Court notes that a physician cannot rely on general experience to give reliable statistical evidence. *See e.g., Erickson v. Baxter Healthcare, Inc.*, 131 F.Supp.2d 995, 999 (N.D.Ill.2001). Therefore, Plaintiff has failed to provide sufficient epidemiological evidence supporting Dr. Johnstone's opinions.[8]

---

**7.** In considering the importance of a 2.0 relative risk, the Court notes that Drs. Concato and Davis noted that "the magnitude of relative risk is a continuum; a threshold of 2.0 is an arbitrary cut-off value, often used to infer than an agent is 'more likely than not' to cause disease." *See also* Reference Manual on Scientific Evidence 384 (2000). In addition, the Ninth Circuit has held that an expert may not be required to produce epidemiological studies when his opinion was based in part on peer reviewed literature. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir.1998), *cert. denied,* 526 U.S. 1099, 119 S.Ct. 1577, 143 L.Ed.2d 672 (1999). There-

fore, the Court considers the 2.0 threshold as a factor, not the dispositive factor, in determining the reliability of Dr. Johnstone's testimony on general causation.

**8.** In her brief, Plaintiff also argues that she should not be required to produce epidemiological studies since Pfizer has not produced any such studies. Whether Pfizer has conducted any studies is irrelevant to the present motion as it is Plaintiff who bears the burden of establishing the admissibility of Dr. Johnstone's testimony regarding general causation.

Further raising concerns about Dr. Johnstone's general causation testimony is the fact that he developed his opinion that SSRIs cause suicide expressly for the purpose of testifying in this case. *See Daubert II*, 43 F.3d at 1317. As he testified in his deposition, he had never voiced this position prior to this litigation.

Finally, Plaintiff argues that this Court should employ a relaxed standard in reviewing Dr. Johnstone's testimony since he is a psychiatric expert. Plaintiff argues that the pre-*Daubert* decision in *Barefoot v. Estelle*, 463 U.S. 880, 896–906, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) establishes that there is a different and relaxed standard applied to behavioral scientists. However, the Court's gatekeeping function remains the same. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("We conclude that *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge"). In seeking to testify that "Zoloft causes suicide," Dr. Johnstone is not seeking to testify as a behavioral scientist; rather, he seeks to testify regarding psychopharmacology and epidemiology—two fields in which he admits that he is not an expert. Therefore, even assuming that a more relaxed standard could apply post-*Daubert & Kumho*, the Court believes that Dr. Johnstone must still meet the standards set forth in *Daubert II*. As Plaintiff's counsel admitted at oral arguments, the proposition that "Zoloft causes suicide" is scientifically testable. Therefore, the fact that Dr. Johnstone cannot point to one scientific study that supports his conclusion on general causation results in his testimony and methodology being unreliable.

In summary, after reviewing the materials relied upon by Dr. Johnstone to establish his expert testimony regarding general causation, the Court does not believe that Dr. Johnstone's opinion that Zoloft causes suicide is supported by these materials. In particular, the Court finds that his reliance upon medical articles which he disavowed as providing evidence of general causation particularly disturbing and, in truth, the antithesis of a scientific method. In addition, as Dr. Johnstone has testified, case reports are not a recognized method of proving causation. Finally, the lack of significant epidemiological studies also undermines the reliability of Dr. Johnstone's testimony regarding general causation. As a result, any testimony that he would present to the jury would only confuse and mislead it.

### Testimony Regarding Specific Causation

█ Regarding Dr. Johnstone's testimony that Zoloft caused Mr. Baskins to commit suicide, there are additional concerns about Dr. Johnstone's methodology. While Pfizer cites a law review article questioning the acceptance of psychological autopsies, these types of post-mortem autopsies appear to be generally accepted. Nonetheless, there is evidence that Dr. Johnstone came to his conclusion before reviewing all of Mr. Baskins' medical records and all of Pfizer's submissions to the FDA. Under *Daubert*, a court may consider whether an expert has reviewed relevant information before forming an opinion. *See Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502–03 (9th Cir.1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of this [scientific] method."). In this case, Dr. Johnstone issued his opinion before reviewing the autopsy report, the St. Mary's hospital records, and records of Mr. Baskins' prescribing physicians and

therapist. As a result, his initial opinion was susceptible to error. For example, his initial opinion records Dr. Johnstone's mistaken belief that Mr. Baskins was taking caffeine pills, rather than the ephedrine that he was actually taking prior to his suicide. Likewise, Dr. Johnstone did not review all the materials that Pfizer had submitted to the FDA even though these materials were in the possession of Plaintiff's counsel. These facts raise significant concerns about his specific causation testimony.

Additionally troubling is the fact that Dr. Johnstone did not fully explore other potential causes of Mr. Baskins' suicide, including his alcohol use and family problems, and the role that ephedrine might have played in Mr. Baskins' suicide. Plaintiff's response that such issues are merely for the jury fails to address the issue that such omissions by its expert raise significant questions about his methodology. *See Claar*, 29 F.3d at 502–03. The process of assessing alternative and specific causes is one of the hallmark tasks of a physician. *See* Reference Manual on Scientific Evidence 468 (2000). *See also Smith v. Pfizer Inc.*, 2001 WL 968369 (D.Kan.2001) (noting that Plaintiff's expert in that case considered the role of alcoholism in the suicide and rejected it and holding that the physician's "methodology is used time and again on a daily basis by medical doctors in diagnosing and determining the cause of illnesses in their patients"). In this case, Plaintiff has not produced evidence to show that Dr. Johnstone considered alternative explanations for the suicide, and as a result, Dr. Johnstone's testimony again appears to lack sufficient reliability to be admissible.

Similarly, there are analytical and scientific gaps between the treatises upon which Dr. Johnstone relies and his findings in this particular case. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") First, the medical articles upon which Dr. Johnstone relies suggest (but do not prove according to his own testimony) a Zoloft-akathisia-suicide link. Likewise, the DSM–IV and DSM–IV–TR provide coding only for SSRI-induced akathisia. However, Dr. Johnstone has testified that Mr. Baskins did not suffer from akathisia. Therefore, his attempts to rely upon these texts to bolster his specific causation testimony are fundamentally flawed. Second, the treatises seem to indicate that if such reactions occur that they generally occur very early during the prescription. In this case, however, there was an 18 month period between the initial prescription and the suicide. Therefore, the gaps in Dr. Johnstone's testimony are simply too great for him to hurdle.

Finally, Dr. Johnstone has testified that the combined effects of Zoloft and the over-the-counter stimulant "together generated in him a dysphoric, manic state, with suicidal desperation and suicidal intent being a feature of that and maybe an additional influence of command hallucinations suggesting that he [commit] suicide." Additionally, he opines that Zoloft caused Mr. Baskins to return to drinking alcohol. Plaintiff has produced no reports or research on Dr. Johnstone's claimed interreaction between the over-the-counter stimulant and Zoloft, nor the proposition that Zoloft increases a patient's urge to drink alcohol. These opinions have not been peer-reviewed, have not been independently tested, and there is no evidence that any other physician or researcher has come to these same opinions.

Finally, in her brief, Plaintiff places great emphasis on *S.M. v. J.K.*, 262 F.3d 914 (9th Cir.2001). In *S.M.*, the Plaintiff's

physician testified that Plaintiff had suffered from Post–Traumatic Stress Disorder even though the diagnosis varied from the DSM–III. *See id.* at 922. The district court allowed the testimony, and the Ninth Circuit affirmed noting that the physician's variance from the DSM did not compel exclusion of the testimony and also that the newly revised DSM–IV actually supported the physician's testimony. *See id.* Contrary to Plaintiff's arguments, *S.M.* is not a major development after *Daubert II,* rather it merely confirmed that physicians can testify contrary to the generally accepted diagnoses as long as they employ a reliable scientific and medical approach. In this particular case, Dr. Johnstone did not employ such an approach, and his opinions, therefore, should be excluded.

Therefore, for the foregoing reasons, Dr. Johnstone's testimony regarding general and specific causation is hereby excluded.

### C. Motion for Summary Judgment re: Causation

For the reasons set forth below, Pfizer's motion for summary judgment is granted. On both of Plaintiff's claims, she must show, as an initial matter, that Zoloft causes suicide and that it particularly caused Mr. Baskins' suicide. As she has failed to present sufficient evidence upon which a reasonable jury could agree with both of those propositions, summary judgment in favor of Pfizer is appropriate.

### Standard of Review Governing Motions for Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *See id.* at 252, 106 S.Ct. 2505. In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *See id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *See id.* at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "must set forth specific facts showing that there is a genuine issue for trial." *Id.* Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

### Arizona Law Governs the Elements of Plaintiff's Claims

██ A federal court sitting in diversity jurisdiction over a product liability claim applies the substantive law of forum state to determine the elements of Plaintiff's cause of action. *See Toner for Toner v. Lederle Laboratories, Div. of American Cyanamid Co.,* 779 F.2d 1429, 1431 (9th Cir.1986) (noting, however, that the question of the sufficiency of the evidence is a procedural matter governed by federal law). The parties do not dispute that Arizona law applies; therefore, the Court will look to Arizona law regarding the necessary elements of Plaintiff's products liability and negligence claims.

██ In order to prevail on both of her claims, Plaintiff must prove causation. In order to establish a prima facie case of strict products liability in Arizona, Plaintiff must show "(1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries." *Piper v. Bear Medical Systems, Inc.,* 180 Ariz. 170, 173, 883 P.2d 407, 410 (App.1993). A product may be unreasonably dangerous in the absence of adequate warnings. *See id.,* 180 Ariz. at 173–74, 883 P.2d at 410–11. In order to establish a prima facie negligence case in Arizona, Plaintiff must show the existence of a duty, breach of that duty, causation, and damages. *See Taeger v. Catholic Family & Cmty. Servs.,* 196 Ariz. 285, 294, 995 P.2d 721, 730 (App.1999).

██ Arizona views causation liberally. "To establish fault, a plaintiff must prove that the defendant's negligence proximately caused the plaintiff's injury." *Stephens v. Bashas' Inc.,* 186 Ariz. 427, 431, 924 P.2d 117, 121 (App.1996). The proximate cause of an injury is defined in Arizona as "that which, in a natural and continuous sequence, unbroken by any effi-

cient intervening cause, produces an injury, and without which the injury would not have occurred." *Robertson v. Sixpence Inns of Am., Inc.,* 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990) (citation omitted). "The defendant's act or omission need not be a 'large' or 'abundant' cause of the injury; even if defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." *Id.* (citation omitted).

### No Reasonable Jury Could Conclude that Zoloft Caused Mr. Baskins' Suicide

██ Even considering Arizona's liberal view of causation, Plaintiff has failed to raise a genuine issue of material fact regarding causation. First, Plaintiff has not provided sufficient evidence such that a reasonable jury could conclude that Zoloft causes suicide. As discussed above, the medical articles and diagnostic texts do not support a finding of legal causation. Likewise, individual case reports and retrospective medical articles summarizing individual case reports are not an adequate basis from which a jury could conclude that Zoloft causes suicide. Similarly, Pfizer's report to the Irish Medicines Board does not constitute an admission of general causation by Pfizer. *See Smith v. Pfizer,* 2001 WL 968369 (D.Kan.2001).

Furthermore, Plaintiff has failed to produce sufficient evidence such that a reasonable jury could conclude that Zoloft caused Mr. Baskins to commit suicide. In this regard, even assuming that the medical articles support general causation, the literature theorizes the following link: Zoloft causes akathisia that results in a suicidal event. In this case, Plaintiff has not presented any admissible evidence that Mr. Baskins suffered from akathisia. Furthermore, in the absence of Dr. Johnstone's testimony, Plaintiff cannot prove

causation. *See Lust By and Through Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F.3d 594, 598 (9th Cir.1996). *See also e.g., Matson v. Naifeh,* 122 Ariz. 360, 362, 595 P.2d 38, 40 (1979) (requiring expert testimony if area of testimony is outside the common knowledge of laymen). Finally, the Court need not address Plaintiff's burden shifting argument under Arizona law regarding labeling because that shifting only occurs after Plaintiff has shown that Zoloft causes suicide and that Zoloft caused Mr. Baskins suicide. Since she cannot prove the underlying elements, the Court does not need to address the labeling issues. Accordingly, summary judgment in favor of Pfizer and against Plaintiff is required as no reasonable jury could conclude that Zoloft caused Mr. Baskins' suicide.

### D. Motion for Partial Summary Judgment re: Punitive Damages

As the Court has already granted summary judgment to Defendant Pfizer, the pending Motion for Partial Summary Judgment re: Punitive Damages is denied as moot.

### III. Conclusion

For the reasons set forth above, Dr. Johnstone's testimony regarding general and specific causation are unreliable and are therefore excluded. Furthermore, Plaintiff has failed to produce sufficient evidence upon which a reasonable jury could agree with her propositions concerning general and specific causation. As a result, summary judgment in favor of Pfizer and against Plaintiff is appropriate.

Accordingly, IT IS HEREBY ORDERED that:

1. Pfizer's Motion to Strike Declaration of Edwin Johnstone, M.D. (Doc. # 164) is DENIED;

2. Pfizer's Motion to Exclude Testimony of Dr. Edwin E. Johnstone (Doc. # 122) is GRANTED;

3. Pfizer's Motion for Summary Judgment re: Causation (Doc. # 136) is GRANTED; and

4. Pfizer's Motion for Partial Summary Judgment re: Punitive Damages (Doc. # 129) is DENIED AS MOOT; and

5. The Clerk of the Court shall enter judgment in favor of Defendant Pfizer and against Plaintiff Laura Cloud.